[Civ. No. 2526. Third Appellate District.—January 24, 1923.]

## S. C. DUNLAP, Appellant, v. A. G. CHATOM et al., Respondents.

[1] CONVERSION—PURCHASE OF BARLEY ON JOINT ACCOUNT—EVIDENCE —FINDINGS.—In this action for damages for the alleged conversion of certain barley claimed to have been purchased on the joint account of plaintiff and defendants, the evidence was sufficient to sustain the findings of the trial court to the effect that the barley in question was not purchased for the joint account of the parties.

APPEAL from a judgment. of the Superior Court of Stanislaus County. J. C. Needham, Judge. Affirmed.

The facts are stated in the opinion of the court.

James W. Bell and L. J. Maddux for Appellant.

R. L. McWilliams and James F. Peck for Respondents.

HART, J.—This is an action for damages in the sum of $6,000 for the alleged conversion of 500 tons of barley

The complaint is cast in the usual form of an action in conversion, and alleges as follows:

"That the plaintiff is informed and believes and on such information and belief alleges that the defendant T. W. Norcross has since the time hereinafter alleged been adjudged an incompetent and one Cope Norcross is the duly authorized, qualified and acting guardian of the person and estate of the said T. W. Norcross; that 'Corcoran Mill & Warehouse' is a fictitious name under which the defendants during all the times herein mentioned conducted a business of buying and selling grain at Corcoran, in the County of Kings, State of California; that on or about the first of June, 1919, the defendants under the name Corcoran Mill & Warehouse purchased of one O. C. Heck, and the said O. C. Heck delivered to the defendants under the name Corcoran Mill & Warehouse, in said County, 500 tons of barley on the joint account of plaintiff and Corcoran Mill & Warehouse, at an agreed price of $2.00 per cwt. under and pursuant to an oral agreement between plaintiff and Corcoran Mill & Warehouse to purchase grain on joint account and to sell only on joint agreement, and when so sold the proceeds thereof to be divided in the proportion of one-half to the plaintiff and one-half to the Corcoran Mill & Warehouse, and if a sale could not' be made as aforesaid, then by said agreement the grain should be divided in like proportion between them. It was also a part of said agreement that said parties should share equally any losses arising out of any purchase made on joint account; that on or about the said first day of June, 1919, at Corcoran, in said County, the defendants, then being in possession of said barley, unlawfully converted and disposed of the same to their own use to the damage of the plaintiff in the sum of $6,000.00."

The defendants A. G. Chatom, Thomas H. Chatom, and Corcoran Mill & Warehouse filed separate answers, specifically denying the averments of the complaint.

The cause was tried by the court, sitting without a jury.

A default was entered against the defendant T. W. Norcross and the action dismissed as to the defendant, J. C. Walsh. As to the other defendants, A. G. and Thomas H. Chatom and Corcoran Mill & Warehouse, the findings followed the denials of the answers and the decision, therefore, was in their favor. Judgment for said defendants was accordingly entered. The appeal is by the plaintiff from said judgment.

[1]   The important contention of the plaintiff is that the findings are without sufficient probative support, but an examination of the evidence as it is presented here has convinced us that it is the contention and not the findings which the record does not support.

The following facts are extracted from the evidence as it was produced before the trial court: For some time prior to the date of the transaction on which this action is predicated, the defendants A. G. Chatom, T. W. Norcross, and J. C. Walsh were copartners, engaged in the buying and selling of grain under the firm name and style of "Corcoran Mill & Warehouse" at the town of Corcoran, in Kings County. During the period of time mentioned, the Corcoran Mill & Warehouse and the plaintiff did on different occasions enter into arrangements whereby they agreed to jointly purchase grain and likewise sell the same, equally sharing the profits of such transactions; or, as the witness A. G. Chatom explained it, "those fellows, my partners down there [referring to Norcross and Walsh], whenever they had a deal that was too large for them to handle, why they would call Dunlap's assistance in for help—probably help finance it." He further stated that the plaintiff was interested only in those deals with the defendants in which he and his partners thought it advantageous or convenient to allow him to participate.   On or very near the twelfth day of April, 1919, the defendant, T. W. Norcross, presumably acting for the copartnership, entered into negotiations with one O. C. Heck, of Lemoore, Kings County, for the purchase of 500 tons of barley.   Heck, testifying on behalf of the plaintiff, stated that he "sold him [Norcross] 500 tons of barley, to be delivered off of the first cutting; that is, the first that the machines cut."   There was not made as to this transaction between Norcross and Heck any agreement or memorandum in writing, nor was any payment made to Heck thereon at the time of these negotiations.   Heck further testified that either in the latter part of April or early part of May, 1919, he met, by appointment, A. G. Chatom, in the office of the Corcoran Mill & Warehouse in Lemoore.   Asked what the conversation or substance thereof was between him and said Chatom, Heck testified: "He was there a couple of days, trying to get me to agree to deliver this 500 tons of barley and I told him I wouldn't do it.   I told him why.   Q.

Well, just state what you told him. A. Well, I told him that
I figured that Norcross and Walsh was out of it, and, if they
were, those were the people that I was doing business with
and I didn't owe anybody any 500 tons of barley.'' Heck
proceeded to say that Chatom insisted that his firm was en-
titled to the barley and threatened to sue Heck if he did not
deliver the same. To this Heck replied, ''Well, all right;
if you think that I owe you 500 tons of barley, and think
that I can't deliver it, or won't, I will show you that I will,
and on that I delivered the 500 tons of barley. . . . He
[A. G. Chatom] made out a little bit of an agreement which
was signed by him and I. The next day I asked him for a
check for $10,000; and he didn't want to give it to me but
he did—his own personal check on this barley.''

We return now to Norcross' activities with respect to
this transaction. On the twenty-fourth day of April, 1919,
he addressed to the plaintiff a letter which, among other
statements, contained the following: ''Our records here for
joint account are as undernoted: 50,000 sack crop (est.) on
1600 acres. This is a conservative estimate. 500 tons June
barley. Both lots being purchased at $2.00 f. o. b. cars; the
50,000 sacks to be delivered at Corcoran and the 500 tons at
Stratford.'' It is most probable—in fact, counsel for the
defendant so assume in their brief—that the ''500 tons of
June barley'' mentioned in said letter was the Heck barley.

It appears from the evidence that the defendants were also
during all the times above referred to transacting business
with a concern known as the U. S. Trading Corporation.
The dealings had with said corporation were always or
generally conducted upon the same general terms as were the
dealings between the plaintiff and the defendants; that is to
say, whenever the U. S. Trading Corporation and the de-
fendants had transactions together involving the purchase
and sale of grain they jointly shared the profits or returns
on such transactions. On the twenty-fifth day of April,
1919 (the day following that on which he addressed the
letter above referred to to Dunlap and approximately twelve
days subsequently to the negotiations he had with Heck),
Norcross addressed a letter to the U. S. Trading Corporation,
in which he said, among other things: ''We beg to confirm
sale of 500 tons of barley at $2.00 f. o. b. either Corcoran or
Stratford.'' It should be noted that the letter addressed

by Norcross to the plaintiff stating that he had purchased the Heck barley on the joint account with the plaintiff and the letter addressed to the U. S. Trading Corporation offering it the 500 tons which Norcross evidently thought he had secured from Heck were written within a few hours of each other. And this brings us to a reference to the testimony tending to show that, at the time he was attempting to consummate a deal with Heck for the 500 tons of barley, Norcross was suffering more or less from the result of excessive alcoholic indulgences, and, inferably from the evidence, also from the inordinate use of some narcotic. It should be added here that he was subsequently committed to the insane asylum and that during the period of time intervening the date on which he was engaged in negotiations with Heck and the date of his commitment to the insane asylum, he was in no mental condition to transact business in a reliable manner.

After Norcross had assured the U. S. Trading Corporation that he would transfer the Heck barley to it, the defendant A. G. Chatom, being of the belief that Norcross was incapable mentally of transacting business, sent a telegram to the Trading Corporation warning it against transacting any further business with Norcross, in so far as the copartnership was concerned, until said Chatom should give said corporation further notice. To this letter the Trading Corporation replied, under date of April 30, 1919, to the effect that when Norcross was in San Francisco he had sold the Heck barley to it. Thereupon said Chatom replied that he would endeavor to carry out any contract made by Norcross with the Trading Corporation with respect to the Heck barley. Chatom explained that the reason he expressed a willingness to let the Trading Corporation have the Heck barley was that said corporation had been one of the very best patrons or customers the Corcoran Mill & Warehouse had and, therefore, he desired to let said corporation have the Heck barley in order to keep its goodwill. Hunsucker, manager of the Corcoran Mill & Warehouse, and the plaintiff also testified that the Trading Corporation had been one of the best customers the defendant had during the years of the existence of the copartnership.

Said Chatom testified that, upon learning that Norcross had told the plaintiff that the Heck barley had been pur-

chased on the joint account of the latter and the Corcoran
Mill & Warehouse and had also about the same time agreed
to sell said barley to the trading corporation, he communi-
cated with the plaintiff, asking him to call at Corcoran for
the purpose of discussing the matter.  The plaintiff appeared
at Corcoran on the fourth day of May, 1919, and a con-
ference was held between him and A. G. Chatom, in the
presence and hearing of Thomas H. Chatom, the son of said
A. G. Chatom.  At this time there was another deal on be-
tween the defendants and one Peterson for the purchase
of the latter's barley amounting to 1,500 tons.  As to what
occurred between the plaintiff and A. G. Chatom on the fourth
day of May, when the former appeared at Corcoran for a
conference with the latter with regard to the Heck barley,
A. G. Chatom testified: ''What, if anything, was said by Mr.
Dunlap in regard to your letting the U. S. Trading Corpora-
tion have the Heck barley?'  A. Well, that is what he said.
He says: 'Let them have it,' he says; 'that is all right.'
He says: 'As long as you get the Peterson barley.'  He says:
'That is good enough for me.  There is ten or twelve thou-
sand dollars in that.'  Q. That is the Peterson barley, you
mean?  A. That was the Peterson barley.  Q. Did you after-
wards get the Peterson's barley?  A. Yes, sir, we made a
brand new—we had to renew a contract; he telegraphed me
from Los Angeles to make a different contract with Peterson
and I had to give Peterson $5 a ton more than the original
contract that Norcross was supposed to have made.''  A. G.
Chatom further testified that on the same occasion the plain-
tiff said to him: ''Go ahead and deliver the Heck barley;
don't count me in this.''  Thomas H. Chatom, in a measure,
corroborated the above testimony of his father.

On June 23, 1919, Dunlap rendered a statement to the
Corcoran Mill & Warehouse, showing the several transactions
occurring between him and the defendants involving the
purchase and sale of grain, which covered a period from and
including May 1st of the year named to and including June
13th of the same year.  Therein no reference was made to
the Heck barley.  In fact, it was stipulated by counsel for
the plaintiff that ''there was no account at any time that
contains any reference to any 500 ton barley purchase in the
year 1919.''

Nothing further was said between plaintiff and the defendants relative to the Heck barley until January 29, 1920, some eight or nine months after the purchase of said barley by Chatom, when the plaintiff addressed to the Corcoran Mill & Warehouse a letter in which, among other things, he said:

"It has just come to my knowledge to-day that O. C. Heck delivered 500 tons of barley in June at $2.00 cwt., f. o. b. cars which was joint account with me and I ask for the proper settlement of this lot or delivery of my half of the barley f. o. b. cars which ever is most convenient to you. You will note by letter from your people to me dated April 24 that you confirm 50,000 sacks of one lot and 500 tons in another lot for joint shipment at $2.00 f. o. b. cars."

In reply to this letter, under date of February 2, 1920, A. G. Chatom wrote, in part:

"How well you knew you had no interest in the Heck 500 tons of barley sold by me to the U. S. Trading Corporation. That matter was fully thrashed out to your satisfaction last spring on your visit to Corcoran, and it was agreed in the presence of three witnesses beside ourselves the Norcross contract of necessity with you was not binding on us and that was exactly my object in sending for you so as to have a clear understanding. You admitted yourself that Norcross was not responsible for his actions and you, your own self, instructed me to wire my connections to disregard all transactions made by Norcross. . . . Norcross had no writing on the Heck contract, but I signed up Heck myself and advanced him ten thousand dollars out of my personal account. But still I delivered you the Peterson barley and made you as you call it a ten thousand dollar Christmas present. . . . We never have continued doing business because the opportunity was never such that we needed to split our profits with anyone, as I am plenty able to finance any small business like the Corcoran Mill and Warehouse."

The above comprehends a fair conspectus of the testimony which the defendants claim (and justly so) affords sufficient support to the findings. There was, as might well be expected, contradictory evidence. The plaintiff himself testified that the understanding was that he should have a joint interest in the transaction involving the purchase and sale of the Heck barley. He stated that before writing his letter to the defendants, dated January 29, 1920, he had had tele-

phonic conversations with A. G. Chatom, in which he insisted
upon his interest in said transaction; but this testimony was
flatly contradicted both by A. G. Chatom and his son Thomas
H. Chatom. Each testified positively that at no time over
the telephone or otherwise did the plaintiff ever make any
suggestion to him that he (plaintiff) claimed an interest in
the Heck transaction after the conference between A. G.
Chatom and the plaintiff the early part of May, 1919. Of
course, it was entirely with the trial court, as the trier of the
facts, to weigh the evidence and determine its probative
effect. It was within its discretion to conclude that the
statement made by the plaintiff to A. G. Chatom at the time of
the conference above referred to that he (plaintiff) could be
"counted out" of the Heck transaction meant that plaintiff
himself understood that he was not to be considered as
jointly interested in said transaction and that such was the
understanding between the parties. The fact that the plain-
tiff, after the conference mentioned, remained perfectly
silent as to the Heck barley for a period of some eight or
nine months, and the further fact that after that transaction
he presented an account to the Corcoran Mill & Warehouse
of the dealings then between them made no reference to the
Heck barley, are circumstances tending strongly to support
the conclusion of the trial court upon the proposition that
the plaintiff did not consider himself and was not interested
in the purchase of the Heck barley. Counsel for the plain-
tiff, however, besides maintaining that there is no evidence
to support the findings, make the further point that the
ground upon which the defendants seek to defeat recovery
herein involves a question of waiver—that is, that the plain-
tiff waived his interest in the Heck transaction, and that,
since relying upon that defense, it was incumbent upon the
defendants to plead and prove such waiver; that no such
allegation and proof having been made, the defense was not
sustained. We do not think there is a question of waiver
involved in the case. It is merely a question of whether the
parties made any agreement as to the Heck barley. As
shown above, there is evidence to the effect that the rela-
tions between the plaintiff and the defendants were not
founded upon a contract covering all the grain transactions
of the defendants, but that the latter, whenever they found it
more convenient to do so, or as A. G. Chatom stated it, when

they were unable themselves to handle a deal alone, they would enter into an agreement with the plaintiff whereby he was made an equal participant in the profits of the particular transaction. It was not a general partnership between the defendants and the plaintiff, but a mere joint adventure in those particular transactions as to which they did make such agreements.

The judgment is affirmed.

Burnett, J., and Finch, P. J., concurred.